UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

UNITED STATES; THE STATE OF        )
COLORADO; STATE OF GEORGIA;        )
STATE OF NEW JERSEY;               )
COMMONWEALTH OF VIRGINIA;          )
STATE OF TENNESSEE; STATE OF       )
TEXAS; THE STATE OF NORTH          )
CAROLINA AND                       )
*ex rel.* DIANA FRANCE             )
                                   )
            Plaintiffs,            )
                                   )
v.                                 )
                                   )
CROSSROADS TREATMENT CENTERS       )
d/b/a CROSSROADS TREATMENT         )
CENTER OF GREENSBORO, P.C.;        )
CROSSROADS TREATMENT CENTER        )    Case No. 6:21-cv-1263-TMC
OF WEAVERVILLE, P.C.;              )
CROSSROADS OF WEAVERVILLE          )
MANAGEMENT CO., LLC;               )    COMPLAINT **FILED IN CAMERA**
CROSSROADS OF GREENSBORO           )    **SEALED**, PURSUANT TO 31 U.S.C. §
MANAGEMENT CO., LLC;               )            3730(b)(2)
CROSSROADS TREATMENT CENTER        )
OF CLEVELAND COUNTY, P.C.;         )    **DO NOT PLACE IN PRESS BOX**
CROSSROADS TREATMENT CENTER        )    **DO NOT ENTER IN PACER**
OF ASHEVILLE, P.C.; CROSSROADS     )
OF ASHEVILLE MANAGEMENT CO.,       )    DEMAND FOR JURY TRIAL
LLC; CROSSROADS TREATMENT          )
CENTER OF CHARLESTON, P.C.;        )
CROSSROADS TREATMENT CENTER        )
OF COLUMBIA, P.C.; CROSSROADS      )
TREATMENT CENTER OF                )
GREENVILLE, P.C.; CROSSROADS       )
TREATMENT CENTER OF MYRTLE         )
BEACH, P.C.; CROSSROADS            )
TREATMENT CENTER OF SENECA,        )
P.C.; CROSSROADS TREATMENT         )
CENTER OF WEST MEMPHIS, P.C.;      )
CROSSROADS TREATMENT CENTER        )
OF DANVILLE, P.C.; CROSSROADS      )
TREATMENT CENTER OF                )
PETERSBURG, P.C.; CROSSROADS       )

TREATMENT CENTER OF SUFFOLK,        )
P.C.; CROSSROADS TREATMENT          )
CENTER OF WINCHESTER, P.C.;         )
STARTING POINT OF VIRGINIA, P.C.;   )
CROSSROADS TREATMENT CENTER         )
OF DENVER, P.C.; CROSSROADS         )
TREATMENT CENTER OF                 )
SUGARLOAF, P.C.; CROSSROADS         )
TREATMENT CENTER OF CALHOUN,        )
P.C.; CROSSROADS TREATMENT          )
CENTER OF DAWSONVILLE, P.C.;        )
CROSSROADS TREATMENT CENTER         )
OF LAGRANGE, P.C.; CROSSROADS       )
TREATMENT CENTER OF                 )
NORTHWEST GEORGIA, P.C.;            )
CROSSROADS TREATMENT CENTER         )
OF SANDY SPRINGS, P.C.;             )
CROSSROADS TREATMENT CENTER         )
OF ATLANTIC COUNTY, P.C.;           )
CROSSROADS TREATMENT CENTER         )
OF CAMDEN COUNTY, P.C.;             )
CROSSROADS TREATMENT CENTER         )
OF NEPTUNE, P.C.; CROSSROADS        )
TREATMENT CENTERS OF NEW            )
JERSEY, P.C.; CROSSROADS            )
TREATMENT CENTER OF TRI-CITIES,     )
P.C.; CROSSROADS TREATMENT          )
CENTERS OF TENNESSEE, P.C.;         )
CROSSROADS TREATMENT CENTER         )
OF FORT WORTH, PLLC;                )
CROSSROADS TREATMENT CENTER         )
OF SAN ANTONIO, PLLC; ACCESSIBLE    )
RECOVERY SERVICES INC. d/b/a ARS    )
TREATMENT CENTERS, P.C.; and        )
RUPERT MCCORMAC, MD                 )

Defendants.

NOW COMES PLAINTIFF-RELATOR, Diana France, by and through her attorneys, on

behalf of the United States of America ("United States"), and the other named Plaintiffs, to recover

losses from false claims submitted to the Medicaid and Medicare programs as a result of the

sustained fraudulent conduct of Crossroads Treatment Centers and its affiliates (hereinafter collectively referred to as "Defendants").

**Introduction**

1. This action is brought under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), seeking treble damages and civil penalties, common law theories of recovery and the North Carolina False Claims Act, N.C. Gen. Stat. § 1-607, *et seq.*, the Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 *et seq.*, the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-5-168 *et seq.*, the New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.*, the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*, the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182 *et seq.*, the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.002 *et seq.*, and among other laws as set forth herein.

2. This action alleges that Defendants knowingly submitted, or caused to be submitted, false claims to Medicaid and Medicare. Specifically, Defendant billed for presumptive and definitive drug screens for Medicaid patients while submitting self-pay patients[1] through a different lab for a dramatically lower cost, billed for definitive drug screens against Medicaid guidelines, charged Medicaid patients more for drug screens than it did self-pay patients, upcoded its physician services, and otherwise unlawfully conducted its business in ways that defrauded the government.

---

[1] "Self-pay" patient means those patients that are not affiliated with any health plan or insurer and instead pay out of pocket. Note: Private health insurance is generally not accepted in the North Carolina Crossroads clinics.

**Jurisdiction and Venue**

3.      This court has jurisdiction over the claims and Defendants pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331, 1345, and 1367(a).

4.      Venue lies in this district and this division pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because one or more Defendants reside in and/or has transacted business within this Court's jurisdiction, and the acts set out herein occurred in this district and this division.

5.      This court has ancillary jurisdiction over the state causes of action because they arise out of the same transaction and occurrence as the federal causes of action.

**Parties**

6.      The United States of America is recovering on behalf of its agencies, including the United States Department of Health and Human Services ("DHHS") and the Centers for Medicare & Medicaid Services ("CMS").

7.      The State of North Carolina is recovering on behalf of its agencies, including the North Carolina Department of Health and Human Services.

8.      The Commonwealth of Virginia is recovering on behalf of its agencies, including the Virginia Department of Medical Assistance Services (DMAS).

9.      The State of Colorado is recovering on behalf of its agencies, including the Colorado Department of Health Care Policy and Financing.

10.     The State of Georgia is recovering on behalf of its agencies, including the Georgia Department of Human Services.

11.     The State of New Jersey is recovering on behalf of its agencies, including the Department of Human Services.

4

12.    The State of Tennessee is recovering on behalf of its agencies, including Tennessee's Medicaid program: TennCare.

13.    The State of Texas is recovering on behalf of its agencies, including Texas Health and Human Services Commission.

14.    Relator Diana France is an individual residing in Mableton, Georgia, having formerly resided in Greenville, South Carolina from February 2018 until December 2019.

15.    France is a former employee of Defendant Crossroads.

16.    France worked for Crossroads as Director of Network Management and Contracting from 2018 until she was terminated on December 2, 2019.

17.    France was terminated the day after she brought the fraudulent billing issues to the attention of Patricia Harrell (Director, Revenue Cycle Management) and Monte Frankenfield (the Chief Financial Officer).

18.    Initially, France was hired by Crossroads to enroll the facilities in Medicaid and to ensure that Crossroads was getting paid by Medicaid.

19.    Defendant Crossroads Treatment Centers ("Crossroads") is headquartered and based in Greenville, South Carolina.

20.    Crossroads treats patients with Opioid Use Disorder and operates over 90 clinics in Colorado, Georgia, Kentucky, New Jersey, North and South Carolina, Pennsylvania, Tennessee, Texas, and Virginia.

21.    Generally, the various centers have their own corporate form, typically as a "professional corporation", as named in the above caption. However, these centers are all part of "Crossroads Treatment Centers" network and run by the same headquarters, are the same brand, share the same officers, and share a single website.

22. Defendant Rupert McCormac, M.D., ("Defendant McCormac") is the Chief Executive Officer and founder of Crossroads and lives in Greenville, South Carolina.

23. Defendant Accessible Recovery Services Inc. d/b/a ARS Treatment Centers, P.C. ("ARS") is incorporated in Pennsylvania and is a subsidiary of Crossroads. Crossroads acquired ARS on October 13, 2018.

24. When Crossroads purchased ARS, Crossroads knew that ARS had compliance issues, including practices involving significant upcoding of services rendered to Medicaid and Medicare beneficiaries.

25. On information and belief, despite Crossroads having this knowledge, Crossroads never corrected these practices.

26. ARS now operates under Crossroads name and brand and makes up Crossroad's Pennsylvania-based locations.

27. Revelstoke Capital Partners LLC ("Revelstoke") is a private equity firm and a limited liability company based in Denver, Colorado.

28. Revelstoke is the principal investor for Crossroads, promoted the expansion of Crossroads through its consistent and substantial financial contributions.

29. Revelstoke is aware of the fraudulent billing practices at Crossroads.

30. Upon information and belief Revelstoke profits from the fraudulent acts of Crossroads.

### The Federal False Claims Act

31. The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly presenting or causing to be presented false or fraudulent claims for payment to the government of the United States and for knowingly making or using false records or

statements material to false or fraudulent claims paid by the United States. 31 U.S.C. §§ 3729(a)(1), (2); 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B) (as amended).

32.    The FCA currently provides, in pertinent part, that a person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
> is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729 (2019).  *See* 28 C.F.R. § 85.3(a)(9).  For violations occurring after November 2, 2015, the penalties range from $11,181 to $22,363.  28 C.F.R. § 85.5.

33.    For purposes of the FCA,

> **(1)** the terms "knowing" and "knowingly"—
>> **(A)** mean that a person, with respect to information—
>> **(i)** has actual knowledge of the information;
>> **(ii)** acts in deliberate ignorance of the truth or falsity of the information;
> or
>> **(iii)** acts in reckless disregard of the truth or falsity of the information;
> and
>> **(B)** require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

34.    The standard of proof under the FCA is preponderance of the evidence.  31 U.S.C. § 3731(d).

### The North Carolina False Claims Act

35.    N.C. Gen. Stat. § 1-607(a) provides:

> Any person who commits any of the following acts shall be liable to the State for three times the amount of damages that the State sustains because of the act of that person. A person who commits any of the following acts also shall be liable to the State for the costs of a civil action brought to recover any of those penalties or damages and shall be liable to the State for a civil penalty of not

less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000), as may be adjusted by Section 5 of the Federal Civil Penalties Inflation Adjustment Act of 1990, P.L. 101-410, as amended, for each violation:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

36.     "Knowingly" is defined as "[w]henever a person, with respect to information, does any of the following: (a) Has actual knowledge of the information. (b) Acts in deliberate ignorance of the truth or falsity of the information. (c) Acts in reckless disregard of the truth or falsity of the information.  Proof of specific intent to defraud is not required." N.C. Gen. Stat. § 1-606(4).

37.     North Carolina's False Claims Act is intended "to deter persons from knowingly causing or assisting in causing the State to pay claims that are false or fraudulent and to provide remedies in the form of treble damages and civil penalties when money is obtained from the State by reason of a false or fraudulent claim."  N.C. Gen. Stat. § 1-605(b).

**North Carolina Medical Assistance Provider False Claims Act**

38.     N.C. Gen. Stat. § 108A-70.12 makes it unlawful for any provider of medical assistance under the Medical Assistance Program to:

(1) Knowingly present, or cause to be presented to the Medical Assistance Program a false or fraudulent claim for payment or approval; or

(2) Knowingly make, use, or cause to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Medical Assistance Program.

39.     N.C. Gen. Stat. § 108-70.12(b) provides for civil penalties.

**Colorado Medicaid False Claims Act**

40.     Col. Rev. Stat. § 25.5-4-303.5 *et seq.* makes a person liable to the state for a civil penalty if a person:

    (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

    (c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

    (d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

    (e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

    (f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act";

    (g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

Col. Rev. Stat. § 25.5-4-305.

41.    The same laws set the amount of the civil penalty. *See id.*

## Georgia State False Medicaid Claims Act

42.    Ga. Code Ann. § 49-4-168 *et seq.* provides for civil penalties for those that submit false claims for government funds, including setting forth the amount of those penalties.

43.     Specifically, Ga. Code Ann. § 49-4-168.1 states: (a) Any person who:

> (1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

> (3) Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;
>      . . . .

> (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program,

shall be liable to the State of Georgia for a civil penalty consistent with the civil penalties provision of the federal False Claims Act, 31 U.S.C. 3729(a), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461); Public Law 101-410), and as further amended by the federal Civil Penalties Inflation Adjustment Improvements Act of 2015 (Sec. 701 of Public Law 114-74), plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person….

### New Jersey False Claims Act

44.     N.J.S.A. § 2A:32C-1 *et seq.* makes a person liable to the state for a civil penalty where the person commits any of the following acts, among other things:

> a. Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

> b. Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

> c. Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;
>      . . . .

N.J.S.A. § 2A:32C-3.

45.    In addition to the provisions of N.J.S.A. §§ 2A:32C-1 *et seq.*, N.J.S.A. § 30:4D-17 also makes unlawful the presentation of false statements and other actions made for the receipt of payment or benefit that person is not otherwise entitled and sets forth penalties thereunder.

### Virginia Fraud Against Taxpayers Act

46.    Va. Code Ann. § 8.01-216.1 *et seq.* sets forth civil penalties for persons who, among other things:

1.    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2.    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3.    Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, 7, or 8;
….

8.    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth;

Va. Code Ann. § 8.01-216.3.

### Tennessee Medicaid False Claims Act

47.    Tenn. Code Ann. § 71-5-181 *et seq.* makes a person liable to the state for a civil penalty where that person:

(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

(B) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program;

(C) Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D); or

(D) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program;

Tenn. Code Ann. § 71-5-182.

48.    Tenn. Code Ann. §§ 71-5-181 *et seq.* sets the rules and amount for the civil penalty.

**Texas Medicaid Fraud Prevention Act**

49.    Tex. Hum. Res. Code Ann. § 36.002 makes the following acts unlawful where a person:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

(4) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: (A) the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as: (i) a hospital; (ii) a nursing facility or skilled nursing facility; (iii) a hospice; (iv) an ICF-IID; (v) an assisted living facility; or (vi) a home health agency; or (B) information required to be

provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(6) knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who: (A) is not licensed to provide the product or render the service, if a license is required; or (B) is not licensed in the manner claimed;

(7) knowingly makes or causes to be made a claim under the Medicaid program for: (A) a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner; (B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or (C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

(8) makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

(9) conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

(10) is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly: (A) fails to provide to an individual a health care benefit or service that the organization is required to provide under the contract; (B) fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision; or (C) engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's

13

managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

(11) knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(12) knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13) knowingly engages in conduct that constitutes a violation under Section 32.039(b).

### Opioid Use Disorder and Treatment

50.    In 2017, the U.S. Department of Health and Human Services (HHS) declared a public health emergency due to the widespread misuse and overdose-related deaths caused by opioids.

51.    In 2017, to combat the epidemic, HHS issued over $800 million in grants to support the treatment and recovery of opioid addiction. Since then, opioid treatment programs have grown throughout the United States, and states and local governments have worked to provide regulations to address this devastating epidemic.

52.    Individuals with opioid addiction can use medication-assisted treatment (MAT), including opioid treatment programs (OTP), which combines medications and behavioral therapy to treat addiction.

53.    Three drugs are approved by the FDA for the treatment of opioid use disorder: naltrexone, methadone, and buprenorphine.

54.    Opioid treatment programs provide medication-assisted treatment for individuals diagnosed with an opioid use disorder. Federal law requires these OTP facilities to provide patients with counseling and behavioral therapy in addition to medication assistance.

55.    OTPs must be accredited by a SAMHSA-approved accrediting body and certified by SAMHSA.

56.    SAMHSA, or the Substance Abuse and Mental Health Services Administration, is the agency within the US Department of Health and Human Services that focuses on behavioral health, like substance abuse and mental illness.

57.    To address the opioid crisis, SAMHSA also provides funding to states to help prevent and treat mental illness and substance abuse and increase access to medication-assisted treatment. For example, the state of North Carolina received funds from the SAMHSA grant.

58.    The Crossroads clinic in Greensboro, North Carolina, alone, received $200,000 from this fund in 2018. See Exhibit Z.

**Medicaid Coverage for Opioid Use Disorder and Treatment**

59.    The Medicaid Program is a health insurance program for low-income individuals and families and is jointly funded by the federal government and states, including North Carolina, Virginia, and Pennsylvania.  The federal government pays states for a specified percentage of program expenditures, determined by the Federal Medical Assistance Percentage ("FMAP").  CMS also helps to administer this program.

60.    Medicaid provides health coverage for individuals with Opioid Use Disorder.  The Affordable Care Act expanded Medicaid coverage for addiction treatment.  Additionally, many states further expanded Medicaid coverage in 2019 for behavioral health services,

such as mental health and substance abuse. To combat the opioid epidemic and in an effort to increase the availability of Medicaid benefits for addiction treatment, states reduced administrative utilization controls.

*The NC Medicaid Program*

61.    NC Department of Health and Human Services ("DHHS") manages the Medicaid program in North Carolina.

62.    Before providers may submit claims, DHHS requires that providers satisfy an enrollment process.

63.    Providers enrolled in Medicaid must follow all Medicaid guidelines.

64.    Additionally, providers enrolled in NC Medicaid are required to "bill their usual and customary charges." Exhibits AA and BB, N.C. Medicaid, *Drug Testing for Opioid Treatment and Controlled Substance Monitoring, Clinical Coverage Policy No: 1S-8,* Attachment A, sec. H.

65.    On information and belief, providers must certify that they are complying with all Medicaid guidelines and regulations when claims are submitted for payment.

66.    Enrolled Medicaid providers can either be individuals or organizations. For example, Crossroads clinics and physicians are all enrolled Medicaid providers, and services performed at these clinics are submitted to Medicaid under either the clinic's or the physician's identification.

67.     To bill Medicaid, providers (both physicians and non-physicians) must complete a certification process through NC Tracks to become "Medicaid certified." As part of this process, providers must also complete training on fraud, waste, and abuse.

68.     In the enrollment process, providers use the National Provider Identifier (NPI), a unique identification code for health care providers. The NPI number will serve as the Medicaid ID number for providers once certified and enrolled.

69.     On information and belief, Defendant Crossroads submits claims under the physician's NPI without the physician's knowledge or approval. On information and belief, Defendant Crossroads engages in this subterfuge in order to reduce the number of claims submitted under its own NPI, reducing Medicaid's opportunity to uncover its fraudulent billing practices.

70.     Claims for payment by Medicaid are processed either by "NCTracks" or through Local Management Entities – Managed Care Organizations (LME-MCOs).

71.     Providers can submit claims for payment and processing through Medicaid's online system, "NCTracks."

72.     Medication-based treatment provided through opioid treatment clinics (like Crossroads) are submitted through NCTracks.

73.     Medicaid directly contracts with LME-MCOs to manage the care of Medicaid beneficiaries who receive services for substance use disorders and mental health.

74.     All behavioral health treatment provided through opioid treatment clinics (like Crossroads) is submitted through these LME-MCOs.

75. The LME-MCOs that worked with Crossroads clinics in North Carolina are Cardinal Innovations Healthcare Solutions, Partners Behavioral Health Management, Sandhills Center, and Vaya Health.

76. Defendant Crossroads has contracts with these LME-MCOs.

77. The contracts provide, among other things, that Defendant Crossroads will comply with federal and state laws, including the federal False Claims Act and the North Carolina counterpart, and regulations concerning the provision or billing of Medicaid-reimbursable or State-funded services. See Exhibits G, H, I, J, K, L and M which includes Defendant Crossroads' contracts with NC LME-MCOs.

78. Additionally, Defendant Crossroads received specific notice and guidance about the federal and state False Claims Act to be used in carrying out its responsibilities and obligations under the LME-MCO contracts. See Exhibits G, H, I, J, K, L and M, "False Claims Act Notice" from Vaya Health.

79. On information and belief, Defendant Crossroads is able to "fly under the radar" and more easily commit fraud because it submits claims to both NCTracks and the LME-MCOs, rather than one central portal, and by also submitting claims under a combination of different physician and provider NPIs. On information and belief, this reduces the chance for audits or post-payment reviews, making it harder for Medicaid to realize the presence and extent of the fraud.

*Virginia's Medicaid Program*

80. Virginia Department of Medical Assistance Services (DMAS) manages Virginia's Medicaid program.

81. Virginia's Medicaid program covers opioid treatment services.

82.     On April 1, 2017, Virginia's Medicaid program launched an enhanced substance use disorder treatment benefit, Addiction and Recovery Treatment Services (ARTS), which provides treatment for those with substance use disorders across the state and expanded access to opioid treatment services, including medication assisted treatment and other types of combination medication, counseling, and psychosocial supports.[2]

83.     In addition to state funds, significant federal funds go towards Virginia's Medicaid program.

84.     In September 2019, Virginia Medicaid was awarded $4.8 million from the Centers for Medicare and Medicaid Services (CMS) Section 1003 Substance Use Disorder (SUD) Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities (SUPPORT) Act Grant.

85.     Like North Carolina's Medicaid Program, Virginia also uses Managed Care Organizations (MCOs) to manage care for beneficiaries. These MCOs are under contract with DMAS.

86.     Providers submit claims directly to the MCOs for payment by Medicaid funds.

87.     DMAS also has a contracted Behavioral Health Services Administrator (BHSA), which is responsible for the management of the behavioral health benefits program and the Addiction and Recovery Treatment Services (ARTS). Magellan Health serves as the BHSA and will contract with providers.

88.     The MCOs used by the State of Virginia to manage Medicaid funds and plans for Medicaid beneficiaries, include but are not necessarily limited to, United Healthcare

---

[2] Addiction and Recovery Treatment Services, Supplement: Opioid Treatment Services/Medicaid Assisted Treatment (DMAS 12/29/2017), https://www.dmas.virginia.gov/files/links/330/Opioid%20Treatment%20Services%20Provider%20Manual%20Supplement.pdf.

Community, Virginia Premier Health Plan, Anthem, Aetna Better Health, and Optima Health.

89.    Providers must contract and be credentialed with the MCOs and the BHSA prior to rendering services.

90.    Providers are required to read, understand, and adhere to all applicable state and federal regulations, their provider agreement with DMAS, their contract with the MCOs or the BHSA, and to the requirements of DMAS Provider Manuals.[3] Providers are further required to ensure that all employees are informed of these regulations and requirements, and the provider certifies on each invoice that all information provided to DMAS, the MCOs, or BHSA, is true, accurate, and complete.[4]

*Pennsylvania's Medical Assistance*

91.    Pennsylvania's Department of Human Services (DHS) manages the Medical Assistance (MA), also known as Medicaid, program for eligible individuals in Pennsylvania.

92.    Typically, behavioral health services, including services for mental health and substance abuse, are delivered through HealthChoices, the name of Pennsylvania's managed care programs for MA recipients.

93.    Like North Carolina, Pennsylvania also uses Managed Care Organizations (MCOs) to manage care for beneficiaries.

94.    The MCO is county-specific and each MA recipient is assigned a behavioral health MCO based on his or her county of residence.

---

[3] Addiction and Recovery Treatment Services, Chapter VI (Utilization and Control), at 7 (DMAS 12/29/2017).
[4] *Id.*

95.    Specifically, the State's Department of Human Services' Office of Mental Health and Substance Abuse Services oversees behavioral health Managed Care Organizations to ensure MA recipients receive access to mental health and substance abuse services.

96.    In order to be a Medicaid provider in Pennsylvania, health care providers must enroll with DHS and receive a Medical Assistance Provider Number.

97.    Providers will then contract with the MCOs and bill the relevant MCO for the services rendered to the MA recipient.

98.    Defendant Crossroads has contracted with MCOs operating on behalf of the MA program in Pennsylvania.

99.    In said contracts, Defendant Crossroads agreed to abide by laws and regulations, including the False Claims Act, and to bill for services actually rendered and that are medically necessary.[5] See Exhibits, N, O, P, Q, R, S, T, U, V, W, X, and Y which includes Defendant Crossroads' contracts with the Managed Care Organizations.

**Medicare Coverage for Opioid Use Disorder and Treatment**

100.    In 1965, Congress enacted the Medicare program under Title XVIII of the Social Security Act, creating the federal health insurance program for Americans 65 years or older, certain individuals with disabilities, and those afflicted with end-stage renal disease. The Centers for Medicare and Medicaid Services (CMS) administers the program.

101.    Medicare is divided into four parts: Part A, Part B, Part C, and Part D. Generally, for substance abuse treatment, Medicare Part A, B, and D can cover various treatment options

---

[5] Among other requirements, for a service, item must be compensable under the MA program, it must be "medically necessary." See 55 Pa. Code §1101.21. This requirement is also stated in Defendant Crossroads' contract with the MCOs.

including inpatient and outpatient treatment, opioid treatment programs, and medication assisted treatment.

102. Medicare is funded through trust fund accounts held by the U.S. Treasury and supported by American taxpayers.

103. Health care providers must have an NPI prior to enrolling in Medicare.

104. Medicare regulations require providers and suppliers to comply with and be knowledgeable of applicable regulations, statutes, and guidelines in order to be reimbursed by Medicare. 42 C.F.R. § 424.516(a)(1), (2).

105. Medicare only covers services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

106. For purposes of the allegations in this complaint, **only Defendant Crossroads' Pennsylvania-based locations accept Medicare**.

107. The Greensboro, NC, clinic and the Virginia clinics do not accept Medicare.

108. Like with Medicaid, Managed Care Organizations can also serve Medicare beneficiaries through its network of affiliated providers for those beneficiaries who voluntarily enrolled in managed care plans.

109. Defendants were well aware that payment for its services came from government funds and knew that fraudulent billing practices, such as the ones practiced by Defendant Crossroads and Defendant McCormac, are unlawful.

110. Specifically, in Defendant Crossroads' contracts with MCOs, Defendant Crossroads acknowledged payments are made from federal funds and agreed to abide by all applicable federal, state, and local laws, including any CMS manuals, guidelines, directions or

instructions promulgated under the Medicare program. See, for example, Defendant

Crossroads' contract with Magellan Healthcare:

> 5.4 **Compliance with Fraud, Waste and Abuse Policies**. Provider agrees to comply with federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the Act), as well as Magellan's Policies and Procedures related to Fraud, Waste and Abuse, which shall include participation in CMS trainings. Provider agrees to comply with Magellan, in any investigation of suspected fraud and abuse.

Magellan Medicare Addendum page 8, 9.

## Defendant's Fraudulent Scheme

*Physician Visit Upcoding*

111.    Providers use a Healthcare Common Procedural Coding System (HCPCS) and a Current

Procedural Terminology (CPT) code to identify the medical service furnished.

112.    Patients are seen by physicians at the clinic locations for basic office visits.

113.    The correct CPT/HCPCS Codes for outpatient office visits depend on whether the patient

is new or established and on the amount of provider time spent with the patient.

114.    For established patients, the office visits use codes 99211 through 99215.

115.    99211 represents a 5 minute office visit, 99212 is 10 minutes, 99213 is 15 minutes, 99214

is 25 minutes, and 99215 is a 40 minute visit with the physician. See Exhibit C ("Magellan

Reimbursement Schedule").

116.    When patients are seen at clinic locations, office visits were processed at 99213, 99214,

or 99215 codes.

117.    All of these codes require at least a minimum of 15 minutes with a physician.

118.    However, generally, patients at the clinics are only seen for 5 or 10 minutes. See, for

example Exhibit DD (Daily Appointment List from 10/1/19 to 2/29/20 for Dr. Bajoghli);

and Exhibits D, E, and F which shows that more patients were seen in a day than is physically possible (if they each were seen the amount of time that was actually billed) due to the fact that a physician was only in a clinic for 6-8 hours per day.

119. For example, Exhibit DD provides a "daily appointment list" for October 1, 2019 through February 2, 2020, for a specific doctor at one of the clinics in Virginia.

120. This Exhibit DD list shows specific patients and the amount of time that they were seen by that physician for the specific date of service.

121. The Exhibit DD list shows that virtually all of these patients were seen for 10 minutes by the physician.

122. Exhibit EE is a compilation of "Encounter Superbills" which provide the billing information used for submitting the claim to the MCOs for payment by government funds.

123. Exhibit EE shows the insurance information of the patient, the date of service, provider, and, importantly, the procedure and code billed.

124. As a specific example, in Exhibit DD, the patient "Patient A" was seen for 10 minutes by Dr. Bajoghli on November 6, 2019.

125. The Exhibit EE (the "superbill") shows Defendant Crossroads used the code of 99215 and represented that Patient A was seen for 40 minutes.

126. Exhibit EE shows that Patient A is a Medicaid patient because her primary insurance shows "United Healthcare Community" which is one of the Medicaid MCOs (as discussed *supra*) and Medicaid was billed for this service.

127. A comparison of Exhibit DD and Exhibit EE in more detail shows many other examples where Medicaid was billed for 40-minute appointments when the patients were only seen for 10 minutes.

128. In addition, Crossroads was put on notice regarding their fraudulent billing practices related to 99213 – 99215 billing codes.

129. A letter dated November 29, 2018, from one of the Medicare Administrative Contractors (MACs) revealed significant billing issues related to the billing of 99213 codes at one of the Defendants' Pennsylvania Clinics.

130. The letter states, "You were chosen for review our data indicates you exceed your peers in the billing of procedure codes 99213 by 2,628 services and $183,438.00." Exhibit FF (November 29, 2018 Letter).

131. The letter shows that 40 claims were randomly selected for review – none of those codes met Medicare guidelines because "documentation submitted did not meet the minimum required components (history/review of systems, physical exam, and medical decision making (MDM) for the billing family of codes."

132. The letter further identified that this claim error rate of 100% for the 40 claims sampled would result in an overpayment by Medicare. *See* Exhibit FF.

133. The result of this practice is that Crossroads is reimbursed at a higher reimbursement rate than for the services that were actually performed.

134. Additionally, the 99213-99215 codes all require that vitals be taken.

135. However, vitals were never taken at these appointments.

136. Without vitals, only a 99211 or 99212 code could be billed.

137. The result of this practice was that Crossroads was reimbursed by government funds at a higher reimbursement rate than what was actually performed.

138. Defendants presented these claims to the government with knowledge that they were false.

139.  The Defendants have this practice in order to maximize the fee they receive from government funds.

140.  The false information presented by Defendants was material to payment.

141.  Although Exhibit DD and Exhibit EE examples show documents and upcoding specific to the Virginia clinics and although Exhibits D, E and F is specific to Pennsylvania clinics, this same upcoding occurred across the board at Crossroads Treatment Centers.

142.  Defendants have a pattern or behavior of doing this type of upcoding and do this across the Crossroads Treatment Center locations.

*Drug Screen Overbilling at the Greensboro, North Carolina Clinic - Crossroads*

143.  The Greensboro, North Carolina, facility is the only clinic operated by Crossroads that operates its own lab in-house.

144.  Crossroads processes drug screens at this lab for patients of the Greensboro clinic.

145.  Specifically, Crossroads almost exclusively processes drug screens for Medicaid patients at the Greensboro clinic's lab.

146.  All drug screens for the Greensboro clinic's self-pay patients are sent to an off-site lab called "Clinical Sciences," which processes those screens at a much cheaper cost.

147.  As explained in the following paragraphs, the drug screens processed at Crossroads' Greensboro clinic for Medicaid beneficiaries are (1) not medically necessary, (2) not in compliance with Medicaid guidelines,[6] and (3) not billed at Defendant's usual and customary charge.

---

[6] Providers "shall comply" with NC Medicaid's clinical coverage policies for reimbursement. N.C. Medicaid, *Drug Testing for Opioid Treatment and Controlled Substance Monitoring, Clinical Coverage Policy No: 1S-8*, § 7.1 and Attachment A.  Furthermore, "Medicaid and

148.    Medicaid provides reimbursement for two different types of drug screens: "presumptive" (reimbursed at $72.00 per test) and "definitive" (reimbursed at about $200 per test).

149.    A presumptive urine drug test "also known as qualitative testing, determines the presence or absence of a drug class in a urine sample and is reported as a positive, negative, or with a numerical value."  N.C. Medicaid, *Drug Testing for Opioid Treatment and Controlled Substance Monitoring, Clinical Coverage Policy No: 1S-8,* § 1.1.9 (effective Jan. 2020).[7]

150.    Definitive drug tests "are always performed in a laboratory [and] confirm the presence of a specific drug identified by a screening test and identify drugs that cannot be isolated by currently available immunoassays."  *Id.* at § 1.0.  Definitive urine drug tests "also known as quantitative or confirmatory testing, identifies specific medications, illicit substances, and metabolites . . . . [r]esults are typically reported in concentrations of nanograms per milliliter (ng/mL)."  *Id.* at § 1.1.4.

151.    North Carolina Medicaid covers presumptive and definitive drug testing for substance use treatment; however, Medicaid has specific requirements for covering definitive drug screens, which are meant to be used as *confirmatory* tests after presumptive screens are completed.

152.    Specifically, Medicaid generally covers definitive drug testing for three purposes: (1) to confirm a negative presumptive result, (2) to confirm a positive presumptive result, and

---

NCHC shall cover the procedure, product, or service related to this policy when medically necessary . . . ." *Id.* at § 3.1. This is included as Exhibits AA and BB.

[7] Quoted material cited to N.C. Medicaid, *Drug Testing for Opioid Treatment and Controlled Substance Monitoring, Clinical Coverage Policy No: 1S-8* (effective Jan. 2020) is substantively similar, if not the same, as the provisions in the version effective March 15, 2019.  The same clinical coverage policy also describes the number and frequency of testing that is covered by Medicaid. This is included with Exhibits AA and BB.

[7] Quoted material cited to N.C. Medicaid, *Dr*

(3) under certain circumstances, as a direct definitive drug screen without an earlier presumptive test:

    a.  <u>Definitive screen to confirm a negative presumptive result</u>: Medicaid only covers definitive drug testing to confirm a *negative presumptive* result when "the presumptive [test] result is inconsistent with a beneficiary's self-report, presentation, medical history, or current prescribed medication plan; following a review of clinical findings the provider suspects use a substance that is inadequately detected or not detected by a presumptive drug test; or to rule out an error as the cause of a negative presumptive result." Exhibits AA and BB, N.C. Medicaid, *Drug Testing for Opioid Treatment and Controlled Substance Monitoring, Clinical Coverage Policy No: 1S-8,* § 3.2.1.6 (effective Jan. 2020).

    b.  <u>Definitive screen to confirm a presumptive positive</u>: Medicaid's coverage only includes definitive drug testing *to confirm a presumptive positive* "when the presumptive result is inconsistent with the expected result, beneficiary self-report, presentation, medical history, or current medication plan." *Id.* at § 3.2.1.7.

    c.  <u>Definitive test without an earlier presumptive test</u>: Medicaid only covers a *direct definitive* drug test "when the test is individualized to the beneficiary based on history of use and substance(s) likely to be present." *Id.* at § 3.2.1.5.

153.  "Presumptive findings, definitive drug tests ordered, and reasons for the testing must be documented in the beneficiary's health record." *Id.* at § 3.2.1.1.

154.  Instead of ordering presumptive screens first, in compliance with Medicaid guidelines, Defendant orders and bills definitive drug screens for Medicaid patients without first

obtaining a presumptive screen and/or without first determining the medical necessity of a direct definitive screen.

155. Defendant rarely orders presumptive tests for Medicaid patients and, instead, the majority of drug screens for these patients are ordered at the higher definitive drug screen code of about $200.

156. The result is that Medicaid is routinely billed for more expensive tests than are necessary and in violation of Medicaid guidelines.

157. Only a physician at Crossroads can order a drug screen.

158. Once a physician orders a test, Defendants hand-key those claims into the system.

159. On information and belief, Crossroads hand-keys these claims—rather than relying on an automated system which is more likely to catch errors—so that the claims will pass through the Medicaid system for payment.

160. This gives Defendants more control to modify the information to ensure the claims will pass through the Medicaid system for payment.

161. On information and belief, a review of patient records will establish that Defendants did not have sufficient grounds to order the majority of the definitive drug tests which were performed. Exhibit A shows the large volume of definitive drug screens performed and billed to Medicaid at the Greensboro clinic compared to the volume of presumptive drug screens performed and billed to Medicaid.

162. Defendant Crossroads knew that this conduct was fraudulent because Defendant intentionally treated Medicaid and self-pay patients differently.

163. While Medicaid patients received presumptive *and* definitive drug screens, self-pay patients almost never had definitive drug screens ordered. Instead, self-pay patients

almost always received presumptive screens from the Clinical Sciences lab at a cheaper cost of $2.33 per screen.

164. The self-pay patient presumptive test of $2.33 is much cheaper than the $75 that Defendant billed Medicaid for a presumptive test.

165. Additionally, self-pay patients did not receive screens performed at the onsite Greensboro lab location, and instead had their tests mailed to Clinical Sciences.

166. Providers may not bill Medicaid recipients more for services than what is customarily and usually billed to non-Medicaid recipients. *See* Exhibits AA and BB, N.C. Medicaid, *Drug Testing for Opioid Treatment and Controlled Substance Monitoring, Clinical Coverage Policy No: 1S-8,* Attachment A, sec. H (Providers enrolled in Medicaid are required to "bill their usual and customary charges.").

167. On or around December 2018, Relator France confronted Defendant McCormac about the drug screen overbilling and fraud issues.

168. Following this discussion, Defendant McCormac told Relator France that the physicians would be retrained on how to properly order drug screens.

169. None of the corrections ever occurred while Relator France was employed by Crossroads and, on information and belief, the fraudulent practice continues.

170. The Crossroads location at Greensboro generates significant income from this drug screen billing practice.

171. Exhibit B compares the revenue differences among the North Carolina clinics.

172. For example, the reason that the Greensboro clinic has higher revenue than the Asheville clinic, which has almost double the number of patients, is attributable to drug screen overbilling at the Greensboro location.

173. Defendants presented these claims to the government with knowledge that they were false.

174. The Defendants have this practice in order to maximize the fee they receive from government funds.

175. The false information presented by Defendants was material to payment.

176. Had the government known that the defendants were knowingly billing the government payors the incorrect code in order to increase the government payment, the government would not have paid.

177. Had the government known that the defendants were knowingly billing the government for medically unnecessary lab tests, the government would not have paid.

178. Defendants have a pattern of behavior of upcoding and overbilling and do this across the Crossroads Treatment Center locations in all states.

*More Fraud at All Clinic Locations*

179. On information and belief, Defendants focus on driving census, rather than complying with Medicare and Medicaid regulations. Specifically (and by no means an exhaustive list):

   a.  Crossroads only audits or reviews the patient encounters and files for Medicaid patients.

   b.  Crossroads requires that Medicaid patients be seen in the clinics more often than self-pay patients.

   c.  Crossroads does not refer patients to higher levels of care or discharge patients when necessary.

d.  On information and belief, these practices and many others are used to generate revenue for Crossroads and result in payment for services that are not medically necessary and/or were not actually rendered.

## COUNT I
### Violations of the FCA: Causing the Presentation of False Claims
### 31 U.S.C. § 3729(a)(1) and (a)(1)(A)

180.  The United States, Commonwealth of Virginia, and States of North Carolina, Colorado, Georgia, New Jersey, Tennessee, and Texas incorporate by reference all preceding paragraphs as if fully set forth herein.

181.  Defendant knowingly presented or with deliberate ignorance or reckless disregard for the truth presented or caused to be presented, to an officer, employee, or agent of the United States, or a contractor thereof, false or fraudulent claims for payment to the United States. Those claims were false or fraudulent because they were for services not medically necessary, in violation of Medicaid and Medicare regulations. Those claims were also false or fraudulent because the claims were not for the services actually rendered and used inappropriate or wrong billing codes.

182.  Defendants' fraudulent conduct caused false claims to be presented to Medicaid and Medicare for payments of federal funds.

183.  Those false claims were material in that they had a natural tendency to influence payment by Medicaid and Medicare.

184.  The United States, Commonwealth of Virginia, and States of North Carolina, Colorado, Georgia, New Jersey, Tennessee, and Texas made payments to Defendants because of the false or fraudulent claims caused by Defendants.

185.   Pursuant to the False Claims Act, defendants are liable to the United States, Commonwealth of Virginia, and States of North Carolina, Colorado, Georgia, New Jersey, Tennessee, and Texas under the treble-damages and civil-penalty provisions of the Act.

### COUNT II
### Violations of the FCA: Use of False Statements
### 31 U.S.C. § 3729(a)(1)(B)

186.   The United States, Commonwealth of Virginia, and States of North Carolina, Colorado, Georgia, New Jersey, Tennessee, and Texas incorporate by reference all preceding paragraphs as if fully set forth herein.

187.   Defendants knowingly or with deliberate ignorance or reckless disregard of the truth, made, used, and caused to be made and used, false records and statements material to false or fraudulent claims in connection with their claims for payment of federal funds for treatment of opioid use disorder.

188.   Defendants made and/or caused to be made numerous false records and statements, which included, *inter alia*, false claims and statements through Defendants' billing practices as set forth herein, including, but not limited to, upcoding services.  As a result of these false records and statements, false claims were submitted to Medicaid and Medicare by Defendants.  Further, Defendants knowingly falsely certified that they would abide by Medicaid and Medicare rules and regulations material to payment.

189.   Defendants' false representations and certifications were made for the purpose of getting false or fraudulent claims for services paid, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendants' statements and actions.

190.    Those false statements were material in that they had a natural tendency to influence payment by Medicaid and Medicare.

191.    The United States, Commonwealth of Virginia, and States of North Carolina, Colorado, Georgia, New Jersey, Tennessee, and Texas paid such false or fraudulent claims because of Defendants' conduct.

192.    The United States, Commonwealth of Virginia, and States of North Carolina, Colorado, Georgia, New Jersey, Tennessee, and Texas have therefore been damaged due to Defendants' conduct, false statements, and false claims.

**COUNT III**
**Violations of the North Carolina False Claims Act**
**N.C. Gen. Stat. § 1-605, *et seq*. and N.C. Gen. Stat. § 108A-70.12**

193.    The United States and State of North Carolina incorporate by reference all preceding paragraphs as if fully set forth herein.

194.    Defendants knowingly and/or with deliberate ignorance or reckless disregard of the truth or falsity of the information presented or caused to be presented false or fraudulent claims for payment or approval to the State and used or caused to be made or used a false record or statement material to a false or fraudulent claim. Defendants, among other things, submitted billing codes that were not for services that were medically necessary.

195.    Defendants' conduct caused these false claims and statements to be submitted to and paid by the State, and but for Defendants' conduct, the State, including its agents, would not have made the same payment decision.

196.    Therefore, the State was harmed by Defendants' false or fraudulent conduct.

**COUNT IV**
**Violations of Colorado Medicaid False Claims Act, Col. Rev. Stat. §§ 25.5-4-303.5 *et seq*.**

197.　Relator re-alleges and incorporates the allegations above as if fully set forth herein and further alleges as follows.

198.　Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Colorado. Upon information and belief, Defendants' actions described herein occurred in the State of Colorado as well.

199.　This is a qui tam action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colorado Revised Statutes § 25.5-4-303.5. *et seq*.

200.　Colorado Revised Statutes § 25.5-4-305 provides liability for any person who-

　　a.　Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

　　b.　Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

　　c.　Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

　　d.　Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

　　e.　Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

　　f.　Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act;"

35

g.  Conspires to commit a violation of paragraphs (a) to (f) of this subsection.

201. Defendants violated Colorado Revised Statutes § 25.5-4-305 from at least since Crossroads opened in the state to the present by engaging in the fraudulent and illegal practices described herein.

202. Defendants furthermore violated Colorado Revised Statutes § 25.5-4-305 and knowingly caused thousands of false claims to be made, used and presented to the State of Colorado from at least since Crossroads opened in the state to the present by its violation of federal and state laws, as described herein.

203. The State of Colorado, by and through the State of Colorado Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

204. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' fraudulent and illegal practices.

205. Had the State of Colorado known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

206. As a result of Defendants' violations of Colorado Revised Statutes § 25.5-4-305 the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

207.   Relator has direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Colorado Revised Statutes § 25.5-4-306(2) on behalf of herself and the State of Colorado.

208.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

209.   Pursuant to the Colorado Medicaid False Claims Act, the State of Colorado and Relator is entitled to the following damages as against Defendants:

    a.   To the STATE OF COLORADO:

        i.   Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' fraudulent and illegal practices;

        ii.   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Colorado;

        iii.   Prejudgment interest; and

        iv.   All costs incurred in bringing this action.

    b.   To RELATOR:

        i.   The maximum amount allowed pursuant to Colorado Revised Statutes § 25.5-4-306(4) and /or any other applicable provision of law;

        ii.   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

        iii.   An award of reasonable attorneys' fees and costs; and

        iv.   Such further relief as this court deems equitable and just.

## COUNT V
**Violations of Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.***

210.    Relator re-alleges and incorporates the allegations above as if fully set forth herein and further alleges as follows.

211.    Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Georgia. Upon information and belief, Defendants' actions described herein occurred in Georgia as well.

212.    This is a qui tam action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.

213.    Ga. Code Ann. § 49-4-168.1 *et seq*. provides liability for any person who—

   a.   Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

   b.   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

   c.   Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

   d.   Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

214.    Defendants violated Ga. Code Ann. § 49-4-168.1 and knowingly caused thousands of false claims to be made, used and presented to the State of Georgia since opening clinics in the state to the present by its violation of federal and state laws, as described herein.

215.    The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

216.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' fraudulent and illegal practices.

217.    Had the State of Georgia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

218.    As a result of Defendants' violations of Ga. Code Ann. § 49-4-168.1, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

219.    Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

220.    Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Ga. Code Ann., § 49-4-168.2(b) on behalf of herself and the State of Georgia.

221.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

222.    Pursuant to the Georgia State False Medicaid Claims Act, the State of Georgia and Relator is entitled to the following damages as against Defendants:

 a. To the STATE OF GEORGIA:

i.  Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' fraudulent and illegal practices;

ii.  A civil penalty of not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

iii.  Prejudgment interest; and

iv.  All costs incurred in bringing this action.

b.  To RELATOR:

i.  The maximum amount allowed pursuant to Ga. Code Ann., § 49-4-168.2(i), and/ or any other applicable provision of law;

ii.  Reimbursement for reasonable expenses which Relator incurred in connection with this action;

iii.  An award of reasonable attorneys' fees and costs; and

iv.  Such further relief as this Court deems equitable and just.

## <u>COUNT VI</u>
**Violations of New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq.* and N.J.S.A. 30:4D-17**

223.  Relator re-alleges and incorporates the allegations above as if fully set forth herein and further alleges as follows.

224.  Additionally, Defendants conduct business in the New Jersey. Upon information and belief, Defendants' actions described herein occurred in New Jersey as well.

225.  This is a qui tam action brought by Relator and State of New Jersey for treble damages and penalties under New Jersey False Claims Act, N.J.S.A. 2A:32C-1 *et seq*.

226.  N.J.S.A. 2A:32C-3 provides liability for any person who—

a.  Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

b.  Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

    c.   Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

227.   In addition, N.J.S.A. 30:4D-17 prohibits solicitation, offers, or receipt of any kickback, rebate or bribe in connection with the furnishing of items or services for which payment is or may be made in whole or in part under the New Jersey Medicaid program, or the furnishing of items or services whose cost is or may be reported in whole or in part in order to obtain benefits or payments under New Jersey Medicaid.

228.   Defendants violated N.J.S.A. 30:4D-17 from since Crossroads opened in the state to the present by engaging in the fraudulent and illegal practices described herein.

229.   Defendants furthermore violated N.J.S.A. 2A:32C-3 and knowingly caused thousands of false claims to be made, used and presented to the State of New Jersey since Crossroads opened in the state by its violation of federal and state laws, including N.J.S.A. 30:4D-17, as described herein.

230.   The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

231.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' fraudulent and illegal practices.

232.   Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

233. As a result of Defendants' violations of N.J.S.A. 2A:32C-3 the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

234. Relator is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to N.J.S.A. 2A:32C-5 on behalf of herself and the State of New Jersey.

235. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

236. Pursuant to the New Jersey False Claims Act, the State of New Jersey and Relator is entitled to the following damages as against Defendants:

    a. To the STATE OF NEW JERSEY:

        i. Three times the amount of actual damages which that State of New Jersey has sustained as a result of Defendants' fraudulent and illegal practices;

        ii. A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

        iii. Prejudgment interest; and

        iv. All costs incurred in bringing this action.

    b. To RELATOR:

        i. The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7 and/or any other applicable provision of law;

        ii. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

        iii. An award of reasonable attorneys' fees and costs; and

        iv. Such further relief as this Court deems equitable and just.

## COUNT VII

**Violations of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.***

237. Relator re-alleges and incorporates the allegations above as if fully set forth herein and further alleges as follows.

238. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the Commonwealth of Virginia. Upon information and belief, Defendants' actions described herein occurred in the Commonwealth of Virginia as well.

239. This is a qui tam action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.

240. Va. Code Ann. § 8.01-216.3 provides liability for any person who-

   a. Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

   b. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth

   c. Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

241. Defendants violated Va. Code Ann. § 8.01-216.3 from since Crossroads opened in the state to the present by engaging in the fraudulent and illegal practices described herein.

242. Defendants furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused thousands of false claims to be made, used and presented to the Commonwealth of Virginia since Crossroads opened in the state from at least since Crossroads opened in the state to the present by its violation of federal and state laws, as described herein.

243. The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and

illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

244. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' fraudulent and illegal practices.

245. Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

246. As a result of Defendants' violations of Va. Code Ann. § 8.01-216.3 the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

247. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of herself and the Commonwealth of Virginia

248. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

249. Pursuant to the Virginia Fraud Against Taxpayers Act, the Commonwealth of Virginia and Relator is entitled to the following damages as against Defendants:

   a. To the COMMONWEALTH OF VIRGINIA:

      i.  Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' fraudulent and illegal practices;

      ii.  A civil penalty of not less than \$5,500 and not more than \$11,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

      iii.  Prejudgment interest; and

      iv.  All costs incurred in bringing this action.

b.  To RELATOR:

      i.  The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and /or any other applicable provision of law;

      ii.  Reimbursement for reasonable expenses which Relator incurred in connection with this action;

      iii.  An award of reasonable attorneys' fees and costs; and

      iv.  Such further relief as this court deems equitable and just.

## COUNT VIII
### Violations of Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182 *et seq.*

250.    Relator re-alleges and incorporates the allegations above as if fully set forth herein and further alleges as follows.

251.    Additionally, Defendants conduct business in the State of Tennessee. Upon information and belief, Defendants' actions described herein occurred in the State of Tennessee as well.

252.    This is a qui tam action brought by Relator and the State of Tennessee to recover treble damages and civil penalties as allowed under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182 *et seq.*

253.    Tenn. Code Ann. § 71-5-182 provides liability for any person who –

a. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

b. Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D); or

c. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the medicaid program.

254. Defendants violated Tenn. Code Ann. § 71-5-182 by engaging in the fraudulent and illegal practices described herein.

255. Defendants furthermore violated Tenn. Code Ann. § 71-5-182 and knowingly caused thousands of false claims to be made, used and presented to the State of Tennessee by its violation of federal and state laws, as described herein.

256. By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Tennessee.

257. The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

258. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' fraudulent and illegal practices.

259. Had the State of Tennessee known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

260. As a result of Defendants' violations of Tenn. Code Ann. § 71-5-181 the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

261. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183 on behalf of herself and in the name of the State of Tennessee.

262. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

263. Pursuant to the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182 *et seq.*, the State of Tennessee and Relator is entitled to the following damages as against Defendants:

    a. To the STATE OF TENNESSEE:

        i. Three times the amount of actual damages which the State has sustained as a result of Defendants' fraudulent and illegal practices;

        ii. A civil penalty of not less than $5,500 and not more than $25,000, as adjusted by the Federal Civil Penalties Adjustment Act of 1990;

        iii. Prejudgment interest; and

        iv. All costs incurred in bringing this action.

    b. To RELATOR:

        i. The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183 and /or any other applicable provision of law;

        ii. Reimbursement for reasonable expenses which Relator incurred in connection with this action;

        iii. An award of reasonable attorneys' fees and costs; and

iv.  Such further relief as this court deems equitable and just.

## COUNT IX
### Violations of Texas Medicaid Fraud Prevention Act,
### Tex. Hum. Res. Code Ann. § 36.002 *et seq.*

264.  Relator re-alleges and incorporates the allegations above as if fully set forth herein and further alleges as follows.

265.  Defendants operated in the State of Texas. Upon information and belief, the above described fraudulent acts also occurred in the State of Texas.

266.  Under Tex. Hum. Res. Code Ann. § 36.002, it is unlawful if a person, among other things:

a.  Knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

b.  Knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

c.  Knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning: the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program or information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program.

d.  Knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who: is not licensed to provide the product or render the service, if  a license is required; or is not licensed in the manner claimed;

e.  Knowingly makes or causes to be made a claim under the Medicaid program for: a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner; a service or product that is substantially inadequate or inappropriate when compare to generally recognized standards within the particular discipline or within the health care industry; or a product that has been adultered, debased, mislabeled, or that is otherwise inappropriate;

f. Makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

g. Conspires to commit a violation of this section;

h. Knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program;

i. Or knowingly engages in conduct that constitutes a violation under Section 32.039(b).

267. Defendants violated § 36.002 by engaging in the fraudulent and illegal practices described herein.

268. Defendants furthermore violated § 36.002 and knowingly caused thousands of false claims to be made, used and presented to the State of Texas by its violation of federal and state laws, as described herein.

269. By virtue of the acts described above, Defendants knowingly concealed and improperly avoided or decreased an obligation to pay money to the State of Texas and knowingly made or caused to be made false statements or misrepresentations of a material fact to receive payments under the Medicaid program that were not authorized or resulted in greater benefit than authorized.

270. The State, by and through the Texas Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

271. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Texas in connection with Defendants' fraudulent and illegal practices.

272. Had the State of Texas known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

273. As a result of Defendants' violations of Tex. Hum. Res. Code Ann § 36.002 the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

274. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tex. Hum. Res. Code Ann. § 36.101 on behalf of herself and in the name of the State of Texas.

275. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

276. Pursuant to the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.002 *et seq.*, the State of Texas and Relator is entitled to the following damages as against Defendants:

    a. To the STATE OF TEXAS:

        i. Two times the amount of actual damages which the State has sustained as a result of Defendants' fraudulent and illegal practices;

        ii. A civil penalty as allowed by law, including as allowed by Tex. Hum. Res. Code Ann. § 36.052;

        iii. An award of reasonable attorney's fees, expenses, and costs incurring in obtaining remedies or in conducting investigations;

        iv. Prejudgment interest; and

      v.  All costs incurred in bringing this action.

  b.  To RELATOR:

      i.  The maximum amount allowed pursuant to Tex. Hum. Res. Code Ann. § 36.110 and /or any other applicable provision of law;

      ii.  Reimbursement for reasonable expenses which Relator incurred in connection with this action;

      iii.  An award of reasonable attorneys' fees and costs; and

      iv.  Such further relief as this court deems equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Relator Diana France, on behalf of herself and the United States, the Commonwealth of Virginia, and the States of North Carolina, Colorado, Georgia, New Jersey, Tennessee, and Texas pray as follows:

  a.  That for violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, this Court enter Judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729, *et seq*., as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, and the costs of this action, with interest, including the costs to the United States and state governments;

  b.  That for violations of the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq*., and N.C. Gen. Stat. § 108A-70.12, this Court enter Judgment against the Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of N.C. Gen. Stat. § 1-605, *et seq.*, as adjusted by the Federal Civil Penalties

Inflation Adjustment Act of 1990, and the costs of this action, with interest, including the costs to the State of North Carolina;

c.  That for violations of the laws of the States of Colorado, Georgia, New Jersey, Tennessee, and Texas, and Commonwealth of Virginia, that the Court enter judgment against the Defendants as requested in the above Counts, and for all other relief that may be allowed by law.

d.  That Relator Diana France be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages in the amount of 30% of the proceeds of the action or settlement of the claim, or the maximum allowed under applicable law;

e.  That a trial by jury be held on all issues; and

f.  That the United States Government, Commonwealth of Virginia, States of North Carolina, Colorado, Georgia, New Jersey, Tennessee, and Texas, and Relator, further receive all relief, both in law and in equity, to which they may reasonably appear entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States demands a jury trial in this case.

Respectfully submitted,

*/s/ William (Bill) Nettles*
William (Bill) Nettles (Federal ID No.: 6586)
Bill Nettles, Attorney at Law
2008 Lincoln Street
Columbia, SC 29201

Telephone: (803) 814-2826
Email: bill@billnettleslaw.com


*/s/ Frances C. Trapp*
Frances C. Trapp (Federal ID No.: 6376)
Bill Nettles, Attorney at Law
2008 Lincoln Street
Columbia, South Carolina, 29201
Telephone: (803) 814-2826
Email: fran.trapp25@gmail.com

*Attorneys for Plaintiff-Relator*


*Pro hac vice to be submitted – /s/ Gary W. Jackson*
Gary W. Jackson (NC Bar No.: 13976)
Law Office of James Scott Farrin
280 South Magnum Street, Suite 400
Durham, North Carolina, 27701
Telephone: (919) 688-4991
Facsimile: (919) 688-4688
Email: gjackson@farrin.com


*Pro hac vice to be submitted - /s/ Kaitlyn E. Fudge*
Kaitlyn E. Fudge (NC Bar No.: 54829)
280 South Magnum Street, Suite 400
Durham, North Carolina, 27701
Telephone: (919) 688-4991
Facsimile: (919) 688-4688
Email: kfudge@farrin.com

*Attorneys for Plaintiff-Relator*


June 9, 2021
Columbia, South Carolina